UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SAMANTHA ZUCKERMAN, an infant,
By her parent and natural guardian,            08 Civ. 3913 (NRB)(KNF)
ROBERTA ZUCKERMAN, and ROBERTA
ZUCKERMAN,

                      Plaintiffs,

-against-

CAMP LAUREL,

                      Defendant.
------------------------------------------------------------X

## DECLARATION OF ROBERTA ZUCKERMAN

I, Roberta Zuckerman, declare and state as follows:

1. I am the mother and natural guardian of Samantha Zuckerman, who resides with me at 75 West End Avenue, New York, New York. We are both plaintiffs in the within case, brought to recover for personal injuries sustained by Samantha on July 30, 2006 while at the defendant's camp. I am fully familiar with the claims raised in this case, the basis being my personal knowledge of same, or, where indicated, based on my belief.

2. Samantha, then 12 years old, was injured during a horseback riding class given by and/or at the direction of the defendant. While Samantha was riding, her saddled slipped and moved, causing her to fall from the horse. We allege that the camp personnel, or the contractors employed by the camp, negligently saddled the horse by

1

failing to properly tighten or "cinch" the saddle and/or failed to check it once Samantha was mounted on the horse.

3. Samantha started attending Camp Laurel in the summer of 2003. Prior to our final decision to commit to Camp Laurel, the camp director, Jeremy Sollinger, visited my family at our home in New York. Mr. Sollinger brought promotional materials for us to peruse, spoke to us at length about the type of camp experience Samantha could expect, the high level of supervision and protection that was afforded to campers, etc.. As an aside, Mr. Sollinger shares a common passion with my husband; the guitar. They played together at this visit for quite some time. It was clear to me that not only was Mr. Sollinger promoting his camp and looking for new business during his visit, he was also using the visit to assure himself that Samantha would be a good fit for his camp. To this end it was important for him to see the prospective camper's home environment. Ultimately, Mr. Sollinger's presentation and very presence in our home weighed heavily in our decision to send Samantha to Camp Laurel.

4. Many of Samantha's friends attended Camp Laurel. Alexandra DaSilva, Mariah Genis, Madeleine Feinberg, and Marc Dannenberg are some of Smanatha's friends that also attended Camp Laurel, though this list is not exclusive. I am aware that Mr. Sollinger, or another camp director, made personal visits to each of these families in New York for the same purposes. I was made aware by Mr. Sollinger at the time of his visit that this was the camp's, as well as his, business practice, i.e., to meet personally with every camper and his/her family at their homes.

5. I have been informed by my attorneys that the defendant seeks to enforce certain clauses contained within the enrollment form I sent to the defendant along with

2

the deposit for Samantha's camp stay. This form was provided to me by the defendant, executed by me at my home and thereafter transmitted by facsimile from New York. The form contains microscopic language under the heading "Terms" that frankly are so small to be almost unreadable. This enrollment form was given to me by the defendant on a take-it or leave-it basis. Some of the language is obviously incorrect. For example, there is language contained in the form as follows:

> I realize that no environment is risk-free, and I have instructed my child on the importance of abiding by the camp's rules, and my child and I both agree that he or she is familiar with these rules and will obey them.

No such rules were provided to my child or me at the time this form was supplied by the defendant.

6. It is important to note that Camp Laurel provided transport for Samantha and other New York campers from New York to Maine, and once camp was over, from Maine to New York. This was accomplished during the years Samantha attended Camp Laurel both by air and bus transport. When it was by air, camp employees, including Mr. Klein and/or Mr. Sollinger met us at LaGuardia Airport where the defendant took physical charge over Samantha; when by bus, Samantha was picked up in New York by bus operators, hired, controlled and supervised by the defendant. Again, Mr. Klein and/or Mr. Sollinger were present at the time.

7. While I have no knowledge of the internal business dealings of the defendant, i.e., where it is incorporated, where it maintains its business offices, where it chooses to advertise, etc., I do take issue with some of the statements contained in Mr. Klein's declaration. Attempting to portray himself as the owner of a small local Maine business that would be irreparably inconvenienced by having to defend a lawsuit in New York is

simply a distortion of the facts. Mr. Klein owns and operates a modern, sophisticated camp business, operating multiple camp facilities and whose activities stretch well beyond the borders of Maine. Most of the principals of the camp live in New York and/or New Jersey, and when not actually in session (which is over 80% of the year) the camp's business is operated from New Jersey. The camp hires virtually no local Maine counselors, rather they are mostly college students with diverse national and international backgrounds. As earlier stated, it is the camp's business practice and policy to travel to the home of each camper wherever that might be. Since there are a large percentage of New York campers, business visits to New York are continuous and often.

8. Interestingly, though Mr. Klein mentions that most of his counselors, instructors and campers come from a number of eastern states, he neglects to include Maine among them. It is obvious that the choice-of-forum clause included in the defendant's microscopic-sized contract language is not to "minimize the time any officers and employees of Camp Laurel must be away from our office to take part in any legal proceedings" [Klein declaration, ¶7]. The camp is only in operation in Maine for seven weeks a year and the rest of the time its business is transacted from New Jersey. Furthermore, Mr. Klein admits that most of his counselors and instructors do not reside in Maine. Neither he nor Mr. Sollinger reside in Maine, other than when camp is in session. It is equally obvious what the real, though insidious, reason for the choice-of-law clause is: to make it inconvenient or impossible for any camper to bring suit against the camp.

9. With respect to the within lawsuit, it would be a terrible hardship and a miscarriage of justice to permit transfer of this case to Maine. As a result of the defendant's negligence, Samantha sustained most serious injuries including a tear of the

4

anterior cruciate ligament of her right knee. She received emergent care in Maine, and upon her return to New York, was treated by a number of medical specialists here. These include orthopaedist Richard Ulin, M.D., rehabilitation specialist Answorth Allen, M.D., and physical therapists at Premier Physical Therapy. All are located in Manhattan. Each of these health service providers are expected to testify as to the nature and severity of Samantha's injuries, and it would be an unbearable hardship to require these doctors and therapists to travel to Maine in order to give testimony. Furthermore, I am informed that fellow camper Sophie Cohen was an eye witness to the occurrences forming the basis of this case. Ms. Cohen resides in Greenwich, Connecticut, and would also be inconvenienced by any transfer herein.

I declare under the penalties of perjury this 11 day of June, 2008 that the foregoing statements are true and correct.

ROBERTA ZUCKERMAN